WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Xavier Bonner, et al.,

    Plaintiffs,

v.

Michigan Logistics Incorporated, et al.,

    Defendants.

No. CV-16-03662-PHX-GMS

**ORDER**

Pending before the Court is the Motion to Compel Individual Arbitration and Stay Proceedings of Defendants Arizona Logistics LLC, Michigan Logistics Incorporated, and Parts Authority Arizona LLC, (Doc. 28).[1] For the following reasons, the Court grants the motion in part and denies the motion in part.

## BACKGROUND

Defendants Arizona Logistics LLC ("Arizona Logistics") and Michigan Logistics Incorporated ("Michigan Logistics") both do business under the name of Diligent Delivery Systems ("Diligent"). (Doc. 1 at 6–7, Doc. 28-1 at 1.) They are affiliated companies and the same person, Larry Browne, is the CEO of both. (Doc. 28-1 at 1.) Mr. Browne, in a declaration attached to the pending Motion, characterized Arizona

---

[1] Plaintiffs have requested oral argument. That request is denied because the parties have had an adequate opportunity to discuss the law, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Inv'rs Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

Logistics' business model as follows:

> Arizona Logistics is a delivery logistics company. It does not perform any deliveries, employ any delivery drivers, or own any delivery vehicles. Instead, it locates customers who need an outside delivery service, and then offers to connect those customers with independent delivery providers ("owner-operators") willing to provide such a service. Arizona Logistics, therefore, acts as a broker by offering a customer's delivery opportunity to an owner-operator and, if the owner-operator accepts, connecting the customer and the owner-operator.

(Doc. 28-1 at 1–2.)

The Plaintiffs in this action are individuals who contracted with Arizona Logistics to serve as delivery drivers. Each signed an Owner Operator Agreement, ("Agreement"), which formed the basis for the contractual relationship between Arizona Logistics and each driver. Each Plaintiff performed deliveries on behalf of Arizona Logistics' customer, Parts Authority Arizona LLC ("Parts Authority"), which runs a chain of automotive parts shops in Arizona. Each Owner Operator Agreement,[2] consistent with Mr. Browne's description of Arizona Logistics' business model, emphasized that the delivery drivers were independent "Owner Operators" and *not* employees of Arizona Logistics. (Doc. 28-2 at 1, Doc. 28-7 at 1.) Plaintiffs allege, however, that Arizona Logistics, Michigan Logistics and Parts Authority "formed a joint employment relationship with respect to Plaintiffs," and that they "constitute a unified operation," "a common enterprise," have "common management, "centralized control of labor relations," "common ownership" and constitute "a single employer" and an "integrated enterprise." (Doc 1 at 9-10).

Plaintiffs allege that Defendants "knowingly misclassified" them as independent contractors, rather than employees. (Doc. 1 at 2–3.) By doing this, Plaintiffs allege, Defendants were able to avoid paying statutorily mandated minimum and overtime wages, shift business expenses to Plaintiffs, avoid payroll taxes and benefits, and obtain

---

[2] The Agreements signed by Plaintiffs Bonner, Ross, Williams and Harris were identical in all relevant aspects, while the Agreement signed by Plaintiff Six differed in certain relevant aspects. To avoid redundancy the Court will cite only to Plaintiff Bonner's Agreement, (Doc. 28-2), and, when necessary, Plaintiff Six's Agreement, (Doc. 28-7).

- 2 -

an unfair competitive advantage in the marketplace. (*Id.*) Plaintiffs bring individual and class claims under the Fair Labor Standards Act ("FLSA") and Arizona's Wage Act, and on a theory of restitution/unjust enrichment.[3] (*Id.* at 12–26.)

Defendants bring this Motion to Compel based on Alternative Dispute Resolution ("ADR") provisions included in the Owner Operator Agreements. The Agreements signed by Plaintiffs Bonner, Ross, Williams and Harris[4] included a four-page provision entitled "Dispute Resolution," which provided in part that:

> (a) **Arbitration of Claims:** In the event of a dispute between the parties, the parties agree to resolve the dispute as described in this paragraph (hereafter "the Arbitration Provision"). This Arbitration Provision is governed by the Federal Arbitration Act, 9 U.S.C. § 1, et seq., and applies to any dispute brought by either Operator or DILIGENT arising out of or related to this Agreement or Operator's relationship with DILIGENT, including termination of the relationship. . . . Except as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law, and therefore this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial.
>
> (i) <u>Claims Covered by Arbitration Provision</u>: Unless carved out below, claims involving the following disputes shall be subject to arbitration under this Arbitration Provision regardless of whether brought by Operator, DILIGENT or any agent acting on behalf of either: (1) disputes arising out of or related to this Agreement; (2) disputes arising out of or related to Operator's relationship with DILIGENT, including termination of the relationship; and (3) disputes arising out of or relating to the interpretation or application of this Arbitration Provision, but not as to the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision. This Arbitration Provision also applies, without limitation, to disputes regarding any city, county, state or federal wage-hour law, trade secrets, unfair competition, compensation, meal or rest periods, expense reimbursement, uniform maintenance, training, termination, discrimination or harassment and claims arising under the . . . Fair Labor Standards Act, . . . and state statutes, if any, addressing the same or similar subject matters, and all other similar federal and state statutory and common law claims (excluding workers' compensation, state

---

[3] The Secretary of Labor subsequently brought suit against Arizona Logistics and Parts Authority for FLSA violations on behalf of over one thousand delivery drivers, including Plaintiffs Bonner, Ross, Williams and Harris but not including Plaintiff Six. (Doc. 28-8 at 10–36.)

[4] Several "consent to sue" letters have been filed on behalf of other putative Plaintiffs, and the parties' pleadings refer to Marcus Thompson, one of these putative Plaintiffs, as a Plaintiff. Until Thompson is joined he is not a party to this lawsuit; the Court does note that to the extent his Owner Operator Agreement is identical to those of Bonner, Ross, Williams and Harris, the same analysis applies.

- 3 -

disability insurance and unemployment insurance claims).

[. . .]

(d) **Class Action Waiver: There shall be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective or representative action ("Class Action Waiver").** Notwithstanding any other clause contained in this Arbitration Provision, the preceding sentence shall not be severable from this Arbitration Provision in any case in which the dispute to be arbitrated is brought as a class, collective or representative action. . . .

(Doc. 28-2 at 7–9.) The ADR provision in Plaintiff Six's Agreement, by contrast, says only the following:

DILIGENT and Operator both agree to resolve any disputes between DILIGENT and Operator directly or with an agreed form of Alternative Dispute Resolution. Both DILIGENT and Operator agree that neither will engage or participate in a collective or class suit against the other.

(Doc. 28-7 at 6.)

Defendants ask the Court to compel arbitration and stay further proceedings based on these contractual provisions.

## DISCUSSION

### I. Legal Standard

Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C. § 2; *see, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 113–19 (2001) (holding that FAA applies to employment contracts except those of transportation workers) (citing 9 U.S.C. §§ 1–2); *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000); *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994), *cert. dismissed*, 515 U.S. 1187 (1995). "Although [a] contract provides that [state] law will govern the contract's construction, the scope of the arbitration clause is governed by federal law." *Tracer Research Corp*, 42 F.3d at 1294 (citing *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1463 (9th Cir.

1983)); *see Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002) (holding that FAA "not only placed arbitration agreements on equal footing with other contracts, but established . . . a federal common law of arbitrability which preempts state law"); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999) ("Federal substantive law governs the question of arbitrability."); *Chiron Corp.*, 207 F.3d at 1130–31 (holding that "district court correctly found that the federal law of arbitrability under the FAA governs the allocation of authority between courts and arbitrators" despite arbitration agreement's choice-of-law provision).[5]

"Notwithstanding the federal policy favoring it, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Tracer Research Corp.*, 42 F.3d at 1294 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)); *see French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 908 (9th Cir. 1986). Where the arbitrability of a dispute is in question, a court must look to the terms of the contract. *See Chiron Corp.*, 207 F.3d at 1130. "'Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Simula*, 175 F.3d at 719 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 (1983)); *see French*, 784 F.2d at 908.

However, a court "cannot expand the parties' agreement to arbitrate in order to achieve greater efficiency [and] the [FAA] 'requires piecemeal resolution when necessary to give effect to an arbitration agreement.'" *Tracer Research Corp.*, 42 F.3d at 1294 (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25) (emphasis in original). "[T]he judicial inquiry . . . must be strictly confined to the question whether the reluctant party did agree to arbitrate[.]" *United Steelworkers*, 363 U.S. at 582. "The court's role under the [FAA] is therefore limited to determining (1) whether a valid agreement to arbitrate

---

[5] However, though "'courts may not invalidate arbitration agreements under state laws applicable only to arbitration provisions,' general contract defenses such as fraud, duress, or unconscionability, grounded in state contract law, may operate to invalidate arbitration agreements." *Circuit City Stores*, 279 F.3d at 892 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)) (emphasis in original).

- 5 -

exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp.*, 207 F.3d at 1130 (citing *Simula*, 175 F.3d at 719–20; *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 477–78 (9th Cir. 1991)); *see Simula*, 175 F.3d at 720 (stating that "the district court can determine only whether a written arbitration agreement exists, and if it does, enforce it in accordance with its terms") (citing *Howard Elec. & Mech. v. Briscoe Co.*, 754 F.2d 847, 849 (9th Cir. 1985)).

**II. Analysis**

**A. Plaintiffs Bonner, Ross, Williams and Harris agreed to arbitration, while Plaintiff Six only agreed to an unspecified form of ADR.**

A court deciding a motion to compel arbitration must first decide whether and to what extent the parties agreed to arbitrate. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985).

With respect to Plaintiffs Bonner, Ross, Williams and Harris, the Agreements clearly contemplate arbitration, including arbitration of all claims at issue in this case. Plaintiffs do not dispute the content of the agreed-to contract, instead raising numerous reasons why the agreed-to arbitration provision is inapplicable or unenforceable. Those arguments will be considered in subsequent sections. *See Mitsubishi Motors Corp.*, 473 U.S. at 628 (noting that only upon finding that an agreement to arbitrate is applicable should a court consider "whether legal constraints external to the parties' agreement foreclose[] the arbitration of . . . claims").

Plaintiff Six's case is more complicated. There is a question of whether the ADR provision of Six's Agreement survives the termination of the Agreement, and a related factual question of whether the Agreement has been terminated. But this factual dispute is actually immaterial, because the ADR provision of Six's Agreement survives any termination of the contract.

The Supreme Court has noted that contractual "provisions relating to remedies and dispute resolution—for example, an arbitration provision—may in some cases survive in order to enforce duties arising under the contract." *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 208 (1991) (citing *Nolde Bros., Inc. v. Local*

*No. 358, Bakery & Confectionery Workers Union*, 430 U.S. 243 (1977)). *Litton* instructs that:

> A postexpiration grievance can be said to arise under the contract [and therefore be subject to the contract's dispute resolution provisions] only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.

*Id.* at 205–06; *see also Operating Eng'rs Local Union No. 3 v. Newmont Mining Corp.*, 476 F.3d 690, 692–93 (9th Cir. 2007). And, courts should "presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement." *Litton*, 501 U.S. at 208. This presumption is overcome only when "negated expressly or by clear implication." *Id.* at 204 (quoting *Nolde Bros.*, 430 U.S. at 255). While the contract in *Litton* dealt with an arbitration provision specifically, the discussion in *Litton* applies to other forms of alternative dispute resolution as well. *See id.* at 208 (addressing "structural provisions relating to remedies and dispute resolution" and "pivotal dispute resolution provision[s]").

Applying the *Litton* presumption, as well as the presumption in favor of arbitration embodied by the FAA, the Sixth Circuit recently held that an arbitration provision survived the termination of a contract, even when that arbitration provision was not specifically mentioned in an otherwise specific survival provision. *See Huffman v. Hilltop Cos., LLC*, 747 F.3d 391, 397–98 (6th Cir. 2014). While the Ninth Circuit has not yet addressed this question, at least one district court in this circuit has adopted *Huffman*'s rationale. *See OwnZones Media Network, Inc. v. Sys. In Motion, LLC*, No. C14-0994JLR, 2014 WL 4626302, at *7 (W.D. Wash. Sept. 15, 2014). The FAA's presumption in favor of arbitration does not apply where, as here, the parties did not actually agree to arbitrate. *See Tracer Research Corp.*, 42 F.3d at 1294. But the presumption of contract interpretation identified in *Litton*—that parties are presumed not to intend the termination of pivotal contractual dispute resolution provisions—does.

The Court therefore applies the reasoning of *Litton* and *Huffman* to Six's Agreement. That the ADR provision was not enumerated in the Agreement's survival provision does not constitute the express or clearly implied negation of the presumption in favor of survivability. Moreover, the dispute here involves "facts and occurrences that arose before expiration." *Litton*, 501 U.S. at 206. Whether or not Six's Agreement has terminated, then, he remains bound by the ADR provision.

However, while Six did agree to an ADR provision that survived any termination of the Agreement, that ADR provision did not specify the form of ADR to which the parties agreed. Arbitration is just "one of several mechanisms of 'alternative dispute resolution,' which is '[a] procedure for settling a dispute *by means other than litigation*, such as arbitration or mediation.'" *Greenwood v. CompuCredit Corp.*, 615 F.3d 1204, 1208 (9th Cir. 2010) (quoting Black's Law Dictionary 86 (8th ed. 2004)), *rev'd on other grounds*, 565 U.S. 95 (2012). There is thus no basis for the Court to compel arbitration specifically. However, the ADR provision in Six's Agreement evinces an agreement between the parties to resolve disagreements through ADR rather than litigation. That the exact ADR procedure was not specified is not a bar to enforcement under Arizona law. *See Lancer Realty & Invs., Inc. v. Anderson*, 146 Ariz. 76, 78, 703 P.2d 1225, 1227 (Ct. App. 1985) ("A party to a contract cannot be permitted to escape the obligations of an agreement . . . just because a condition of that contract has been left to be ironed out later.").

Barring external reasons to be considered in subsequent paragraphs, the Court will honor the parties' bargained-for agreement to resolve disputes through alternative dispute resolution rather than litigation.

B. **The Federal Arbitration Act applies to the Agreements signed by Plaintiffs Bonner, Ross, Williams and Harris.**

The FAA provides in relevant part that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, shall be valid, irrevocable, and enforceable, save upon such

grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The FAA does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

The Supreme Court has held that the applicability language of § 2 is to be construed broadly, so as to "provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause." *Perry v. Thomas*, 482 U.S. 483, 490 (1987). There is no dispute that delivery drivers such as the plaintiffs here are "involved" in commerce within the broad meaning of Congress's power to regulate interstate commerce. *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) ("Our case law firmly establishes Congress's power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce."). Thus the FAA presumptively applies to their contracts.

By contrast, the exception language of § 1 is construed more narrowly. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 117–19 (2001). Here, "engaged in foreign or interstate commerce" does not invoke the extent to which Congress may regulate commerce, but rather more closely tracks the plain meaning of the phrase. In essence, it is meant to exclude the contracts of workers who are literally engaged in the process of moving goods across state and national boundaries—workers like seamen and railroad employees. *See Levin v. Caviar, Inc.*, 146 F. Supp. 1146, 1152–54 (N.D. Cal. 2015). Thus, the plaintiffs here were not engaged in foreign or interstate commerce, and the Court need not address the dependent argument that the Agreements were contracts of employment within the meaning of § 1. *See id.* at 1154–55.

As a result, to the extent that the relevant parties are bound, and no other exceptions are called for, the Court must compel arbitration. *See* 9 U.S.C. § 4 ("[T]he court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.").

**C. Michigan Logistics and Parts Authority may invoke the arbitration/ADR provisions of the Agreements**.

Michigan Logistics and Parts Authority, Defendants here but non-signatories to the Agreements, seek to enforce the ADR provisions of the Agreements. Under the circumstances of this case, they may do so. Plaintiffs allege that Arizona Logistics, Michigan Logistics and Parts Authority "formed a joint employment relationship with respect to Plaintiffs," and that they "constitute a unified operation," "a common enterprise," have "common management, "centralized control of labor relations," "common ownership" and constitute "a single employer" and an "integrated enterprise." (Doc 1 at 9–10.)

The Arizona Court of Appeals[6] has adopted the "alternative estoppel" theory of non-signatory enforcement of arbitration clauses against signatories. *See Sun Valley Ranch 308 Ltd. P'ship ex rel. Englewood Props., Inc. v. Robson*, 231 Ariz. 287, 296–97, 294 P.3d 125, 134–35 (Ct. App. 2012). Alternative estoppel "takes into consideration the relationships of persons, wrongs, and issues." *Id.* at 296 (quoting *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003)). Specifically,

> [a] nonsignatory can enforce an arbitration clause against a signatory to the agreement in several circumstances. One is when the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided. Another is when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting [its] claims against the nonsignatory. When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.

---

[6] "'[T]raditional principles of state law' determine whether a 'contract [may] be enforced by or against nonparties to the contract through . . . third-party beneficiary theories . . . and estoppel.'" *Rajagopalan v. NoteWorld, LLC*, 718 F.3d 844, 847 (9th Cir. 2013) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)). A federal court sitting in diversity applies the forum state's choice-of-law rules to determine what state's law to apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Arizona courts apply the "law of the state having the most significant relationship to the transaction and to the parties." *Landi v. Arkules*, 172 Ariz. 126, 131, 835 P.2d 458, 463 (Ct. App. 1992). Here, there is no dispute that that state is Arizona and the Court thus applies Arizona law.

*Id.* at 296–97 (quoting *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005)).

The relationship between the signatory and nonsignatory defendants here, as alleged in the complaint, is not one of distinct, separate entities. Plaintiffs allege that all the Defendants are together joint employers. According to the Complaint:

> Defendant Parts Authority Arizona LLC's Drivers were all hired by Defendants Michigan Logistics Inc. and Arizona Logistics LLC; however, the Drivers['] day to day employment was and is controlled by Defendant Parts Authority Arizona LLC, who required and continues to require the Drivers to report to various Parts Authority Arizona LLC stores each workday in order to deliver[] necessary supplies.

(Doc. 1 at 3–4.) Plaintiffs allege that this arrangement constituted a "joint employment relationship," wherein "Defendants Michigan Logistics Inc. and Arizona Logistics LLC hire employees who are supervised by Defendant Parts Authority." (*Id.* at 9.) They further allege that the Defendants "constitute a unified operation," a "common enterprise," and a "single employer"; have "interrelated operations," "common management," "a centralized control of labor relations," and "common ownership"; and that they "commingled funds" and "share the same physical addresses." (*Id.* at 9–10.)

Various courts across the country have confronted similar factual allegations and applied alternative estoppel to allow nonsignatory defendants to invoke arbitration provisions. *Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115 (2d Cir. 2010), involved a makeup artist suing multiple entities for retaliation and sexual harassment. The plaintiff, Ragone, was employed by Atlantic Video, with whom she had signed an arbitration agreement. 595 F.3d at 118–19. ESPN was a client of Atlantic Video's, and Ragone performed services for ESPN, who was not a signatory to the arbitration agreement. *Id.* at 119. Ragone sued both Atlantic Video and ESPN (as well as certain individuals); the defendants sought to invoke the arbitration agreement. *Id.* at 117. In allowing ESPN to invoke the arbitration provision under an estoppel theory, the Second Circuit noted:

> It is true, as we have already said, that ESPN is not mentioned in the arbitration agreement, or in any other document relating to Ragone's initial employment that is contained in the record. . . . Nevertheless, as set forth in her complaint, it is plain that when Ragone was hired by AVI, she

- 11 -

> understood ESPN to be, to a considerable extent, her co-employer. . . . Further, while "she reported to [AVI management]," she "was also required to follow the instructions and directives of ESPN talent and ESPN supervisors on the set. . . ."
>
> [. . .]
>
> In this case, there is . . . no question that the subject matter of the dispute between Ragone and AVI is factually intertwined with the dispute between Ragone and ESPN. It is, in fact, the same dispute: whether or not Ragone was subjected to acts of sexual harassment which were condoned by supervisory personnel at AVI and ESPN. . . .

*Id.* at 127–28. The Southern District of New York likewise applied estoppel in allowing a nonsignatory to invoke an arbitration provision, in a lawsuit with nearly identical facts to this one. *See Ouedraogo v. A-1 Int'l Courier Serv., Inc.*, No. 12 Civ. 5651(AJN), 2014 WL 1172581, at *4–5 (S.D.N.Y. Mar. 21, 2014) (allowing nonsignatory defendant to enforce arbitration clause against delivery driver who asserted claims under FLSA). And multiple district courts have emphasized in similar contexts that plaintiffs "cannot be permitted to argue Defendants are joint employers while, at the same time, argue their relationship is not so close that all Defendants cannot compel arbitration." *Arnold v. DirecTV*, No. 4:10-CV-00352-JAR, 2013 WL 6159456, at *4 (E.D. Mo. Nov. 25, 2013) (quoting *Carter v. Affiliated Comput. Servs., Inc.*, No. 6:10-cv-06074, 2010 WL 5572078, at *4 (W.D. Ark. Dec. 15, 2010)).

Given the allegations Plaintiffs make in this case, this reasoning is persuasive and applicable here. Thus alternative estoppel is appropriate and the nonsignatory Defendants here may invoke the arbitration provisions of the Agreements. Because the Court finds that the non-signatory Defendants may seek to enforce the arbitration provisions of the Agreements as a matter of estoppel, the Court need not reach the alternative argument that they may do so as third-party beneficiaries to the Agreements.

**D. The concerted action waiver does not bar enforcement of the arbitration/ADR provisions.**

Courts may not enforce arbitration agreements that are unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Ninth Circuit recently held that the National Labor Relations Act ("NLRA")

precludes enforcement of an arbitration provision that included a concerted action waiver. *See Morris v. Ernst & Young, LLP*, 834 F.3d 975, 983–84 (9th Cir. 2016). However, this holding does not apply when the employee had a right to opt out of the concerted action waiver. *Id.* at 982 n.4; *see also Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1076 (9th Cir. 2014).[7]

Here, the Agreements signed by Plaintiffs Bonner, Ross, Williams and Harris had such an opt-out provision:

> (h) **Opt-Out Provision:** If Operator does not want to be subject to this Arbitration Provision, Operator may opt out of this Arbitration Provision by notifying DILIGENT in writing of Operator's desire to opt out of this Arbitration Provision, which writing must be dated, signed and submitted by U.S. Mail or hand delivery to DILIGENT at Arizona Logistics, Inc. d/b/a Diligent Delivery Systems, 333 N. Sam Houston Pkwy E, St 500, Houston, TX 77060. In order to be effective, the writing must clearly indicate Operator's intent to opt out of this Arbitration Provision and the envelope containing the signed writing **must be postmarked within 30 days** of the date this Agreement is executed by Operator. Operator's writing opting out of this Arbitration Provision will be filed with a copy of this Agreement and maintained by DILIGENT. Should Operator not opt out of this Arbitration Provision within the 30-day period, Operator and DILIGENT shall be bound by the terms of this Arbitration Provision.

(Doc. 28-2 at 10.) Other courts have found that *Morris* does not bar concerted action waivers when such a 30-day opt out period is provided. *See, e.g.*, *Galvan v. Michael Kors USA Holdings, Inc.*, No. CV 16-07379-BRO (AFMx), 2017 WL 253985, at *9 (C.D. Cal. Jan. 19, 2017). Therefore, even assuming that Plaintiffs are employees within the meaning of the NLRA, the Court is not barred from enforcing the Arbitration Provision against Plaintiffs Bonner, Ross, Williams and Harris.[8]

Plaintiff Six's Agreement, however, did not include an opt-out. Under the *Morris*

---

[7] The protections afforded by the NLRA to "employees" do not extend to independent contractors. 29 U.S.C. § 152(3). The question of whether Plaintiffs are employees or independent contractors is at the heart of the dispute between the parties, and the Court need not resolve it here. For purposes of the concerted action waiver analysis, the Court assumes without deciding that Plaintiffs are employees and covered by the NLRA.

[8] The Ninth Circuit did not reach the question of whether concerted action waivers violate the Norris LaGuardia Act. *Morris*, 834 F.3d at 990. Even assuming they do, the opt-out provision would still allow the concerted action waiver to stand. *See Johnmohammadi*, 755 F.3d at 1077.

analysis, the concerted action waiver in Six's Agreement would thus be unenforceable under the NLRA. The Court must therefore determine whether the concerted action waiver is severable, such that the remainder of the ADR provision may still be enforced. *See Morris*, 834 F.3d at 990.

In Arizona, "[g]enerally, courts do not rewrite contracts for parties." *Olliver/Pilcher Ins., Inc. v. Daniels*, 148 Ariz. 530, 533, 715 P.2d 1218, 1221 (1986). However, "[i]f it is clear from its terms that a contract was intended to be severable, the court can enforce the lawful part and ignore the unlawful part." *Id.* This intent need not be made explicit in certain cases. "The Arizona Supreme Court has recognized that in the context of contract creating restrictive covenants but not containing a severability clause, Arizona courts will eliminate 'grammatically severable, unreasonable provisions.'" *Cooper v. QC Fin. Servs., Inc.*, 503 F. Supp. 2d 1266, 1291 (D. Ariz. 2007) (quoting *Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 213 Ariz. 24, 32, 138 P.3d 723, 731 (2006)).

Citing these principles of Arizona law, the court in *Cooper* severed, as unconscionable, a concerted action waiver from an otherwise enforceable arbitration provision. 503 F. Supp. 2d at 1291. In so doing, the court noted that "[p]reserving the arbitration provision sans [the unconscionable concerted action waiver] is . . . consistent with the Federal Arbitration Act and Arizona public policy favoring both arbitration and class actions." *Id.* at 1292.

Under the same principles of federal and Arizona law, the concerted action waiver in Six's Agreement is severable. Therefore, even assuming that the NLRA applies to Six as an employee, and a concerted action waiver without an opt-out would be unenforceable, that concerted action waiver may be severed and the Court may still enforce the ADR provision against Six.

## CONCLUSION

The ADR provisions of the Agreements are therefore enforceable against each Plaintiff. Plaintiffs Bonner, Ross, Williams and Harris agreed to a specific form of

arbitration and the Court therefore compels arbitration as to these Plaintiffs as described in each Agreement. Further proceedings in this Court are stayed. With respect to Plaintiff Six, the Court orders that Six initiate an ADR proceeding as contemplated in the Agreement if he wishes to pursue a remedy. Further proceedings in this Court as to Plaintiff Six are also stayed.

**IT IS THEREFORE ORDERED** that the Motion to Compel Individual Arbitration and Stay Proceedings of Defendants Arizona Logistics LLC, Michigan Logistics Incorporated, and Parts Authority Arizona LLC, (Doc. 28), is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiffs Bonner, Ross, Williams and Harris must individually arbitrate their claims against Defendants as contemplated in each Plaintiff's Owner Operator Agreement; and that further proceedings in this Court as to these claims are stayed.

**IT IS FURTHER ORDERED** that proceedings as to Plaintiff Six are stayed to allow him to pursue his claims against Defendants through a form of ADR, as contemplated in his Owner Operator Agreement. Should any dispute arise out of the parties' contractual obligation to agree upon a specific ADR procedure and/or the form of ADR initiated by Six, the Court will hear such dispute and/or lift the stay in this matter.

**IT IS FURTHER ORDERED** directing the Clerk of Court to continue the stay of this action until further Order of the Court. The parties are directed to file a status report on or before **July 19, 2017 and every ninety (90) days thereafter** until the stay has been lifted.

Dated this 20th day of April, 2017.

_____
Honorable G. Murray Snow
United States District Judge